FILED

2004 OCT -4 A 11: 27

U.S. DISTRICT COURT
HARTFORD, CT.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARY SAROJAK | ) | CIVIL ACTION NO.: 3:03cv1050(DJS) |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE METALLICS GROUP | ) | |
| D/B/A METALLICS, INC AND | ) | |
| F. MICHAEL MOLA | ) | |
| Defendants. | ) | |

## PLAINTIFF MARY SAROJAK'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Mary Sarojak, ("Ms. Sarojak" or "plaintiff") through her legal counsel, hereby files her

Memorandum in Opposition to Defendants, The Metallics Group d/b/a Metallics, Inc. ("Metallics") and

Mr. F. Michael Mola ("Mola") (collectively "Defendants") Motion for Summary Judgment.

### INTRODUCTION

#### Plaintiff's Employment

Plaintiff, had been employed for approximately one and one-half (1½) years as Metallics' Purchasing

Agent. Prior to her complaining about sexual harassment, she enjoyed her employment at Metallics, and

her performance and effort was never an issue nor ever in doubt.

#### Adverse Employment Action

The seeds of this litigation arise out of several incidents that occurred in the span of less than one (1)

month, beginning on and about March 22, 2001, the date the defendant ordered the plaintiff to participate

in the "Entertainment" portion of a National Sales Meeting held at its Connecticut offices, and

culminating on April 20 2001, the date plaintiff's job was wrongfully terminated under the guise of a "job elimination."

In the span between these two (2) dates, the plaintiff:

    i.    complained of sexual harassment to her immediate supervisor (March 22, 2001);

    ii.    filed a formal complaint with the defendants human resources department (March 29, 2001);

    iii.    received an acknowledgement concerning her complaint that the defendants "overreached" (April 3, 2001);

    iv.    was summoned to appear at her first and only disciplinary counseling meeting in which no less than five (5) members of the defendant's alleged "management team" participated (April 12, 2001);

    v.    received her first and only written disciplinary warning signed by these same five (5) members of the defendant's alleged management team (April 12, 2001);

    vi.    had her office relocated away from her immediate supervisor, the only individual who would assist the plaintiff in opposing discrimination (In or about April 16, 2001);

    vii.    was terminated, along with her immediate supervisor, allegedly due to a job elimination (April 20, 2001).

In point of fact, however, by both act and deed, the Defendants' form of "Entertainment" at the expense of the Plaintiff went far beyond the bounds of decency and good taste. While we all know that good natured fun can at times get out of hand, that which the plaintiff found herself subjected to was neither good natured nor benign. It was sexually and racially charged filth, intentionally calculated to do just what the defendants wanted it to do – bring on laughs from the audience – which it most certainly did, and all at the direct expense of the Plaintiff. This is also an unusual case in that in place of a large segment of what otherwise could have been the subject of "he said …she said" there exists a videotape, but no absence of disagreement concerning its implications and interpretation. The plaintiff asked this writer to pose the following question to this Honorable Court, the very same question that will be posed at

time of trial – had it been your daughter or loved-one who was videotaped and portrayed in the words of Defendant Mola: *"to show you exactly what it is that we do all day long to have fun"* – and the fun, unbeknownst to your loved-one, was that of being sexually taken by two (2) men of a different race, simultaneously from no less than two (2) orifices, and before an audience of some 40 – 50 men who each received their own personal copy of this sexually charged video tape to take home as a remembrance ...would you be laughing? And if your daughter or loved-one was then subjected to multiple retaliatory acts immediately after she complained, acts which culminated in a retaliatory discharge ...would you be laughing or would you seek justice, as the plaintiff, Mary Sarojak asks of this Honorable Court.

### *The Sales Meeting*

On March 22, 2001, Metallics held a National Sales Meeting at its Bristol, Connecticut offices. As a viewing of the video tape offered by the defendant's demonstrates, the so-called *"Entertainment"* was replete with sexual and racial innuendoes of the worst kind, and was all conducted at the expense of the participants, themselves in a protected class, and all to the amusement of the predominantly white-male audience of sales representatives. On information and belief, of the forty (40) to fifty (50) people in attendance only one (1) was female.

### *The Sexually and Racially Charged "Entertainment"*

At the beginning of the *"Entertainment"[1]* segment of the meeting, the defendants ushered in four (4) female employees (ladies), including the plaintiff. Defendant Mola introduced them to the nearly all-male audience stating:

> *"Is the entertainment ready ...we asked beautiful woman... and we've got the Playboy ...Easter Bunnies from Metallics about to come out here and to show you exactly what it is that we do all day long to have fun. Come on Easter Bunnies, come on out"*

---

[1]    As characterized by Defendant Mola.

3

Clearly, the only criteria for the selection of these four (4) ladies was their being female, young, Caucasian (white) and beautiful. Dutifully complying with Defendant Mola's orders, they all came forward to the front of the room and lined-up, shoulder-to-shoulder, behind a table where they placed and switched-on the light-colored, battery-operated Bunny's that each had been provided by Defendant Mola. The ladies, each with their representative Bunny now hopping up-and-down on the table in front of them, all stood there to the laughter and amusement of the audience.

The next segment of the *"Entertainment"* featured another two (2) employees, this time both African-American females who Defendant Mola introduced as *"... the girls who do Order Processing."* With that introduction, the Order Processing girls came out and took their positions behind the table where they placed the black, battery-operated Bears that each had been provided by Defendant Mola. As if concerned that his audience might somehow miss the mimicry that he created, Defendant Mola motioned toward the Bears stating *"... notice there is an Order in the hand,"* after which he gives the *"Okay"* for the "girls" to switch-on their Bears. Defendant Mola can then be heard cajoling the girls to both dance, which they both subsequently did -- again all to the same laughter and amusement of the audience.

In the third and final segment of *"Entertainment,"* Mr. Mola proudly announces - *"Now we got a couple of top-dogs coming out here now ...and what we got is our Plant Manager, Andre Evans, and the fellow that is with him Charlie Gibson ... so lets have the big-dogs ... come on."* At this point, Messrs. Evans and Gibson, both tall and very dark-skinned, black males came forward. Plant Manager, Andrea Evans then stated – *"Yes, we are representative of the shipping department ...and we would just want to let you guys know when we get your order ... we jump when we get your order."* Messrs. Evans and Gibson then both placed the black Scooby Doo Dogs (Scooby's) that each had been provided by Defendant Mola on the

table, and a voice can be heard requesting – *"Can we have the Bunny, please."* With that instruction, the plaintiff, who by contrast to Messrs. Evans and Gibson is a very petite, very fair-skinned Caucasian, with very blonde hair, came out for a second command performance and took her assigned place between these two (2) gentlemen, placing her Bunny on the table between the two (2) Scooby's. Significantly, the battery-operated Scooby's stood upright on two (2) paws, with what appeared to be a Pogo Stick, diagonally appended to its body at waist-level. At this point, the two (2) dark-colored Scooby's representing the two (2) black males, and the one (1) light-colored Bunny, representing the Caucasian plaintiff, were all switched-on. With the Scooby's both moving in a manner that unmistakably mimicked fornication and the Bunny now hopping up-and-down, Defendant Mola, not satisfied with the racist, sexual imagery that he was striving for by having Ms. Sarojak positioned between two (2) black males, took one of the Scooby's, and repositioned it on the table so that the appended Pogo Stick appeared to be fornicating with the Plaintiff's Bunny from its rear-end. This was followed by Mr. Gibson taking the other Scooby and repositioning it to appear as though it was fornicating with Ms. Sarajok's Bunny from the front, simultaneously. With the room full of male sales representatives cheering for the Scooby's and all laughing, the plaintiff can be seen covering her face, grabbing the Bunny from the table, and quickly exiting the room.

Mortified and embarrassed, Ms. Sarojak left the building and drove to the home of her parents where she sought to be consoled. Later in the day she returned to work and promptly complained to her immediate supervisor, Mr. Robert Sobczak ("Mr. Sobczak") about defendants' despicable behavior early that morning. After several attempts and with the assistance of Mr. Sobczak, the plaintiff was finally able to meet with defendant's human resource director to make a formal complaint against Mr. Mola. Less then two (2) weeks later, the defendant issued what only can be described as an insincere attempt at justifying its unlawful and egregious behavior. Aside from the disingenuous nature of defendants' April 3rd

memorandum which reads more like a justification for its behavior ("we are after all only human"), than an apology, defendants readily admit that it acted inappropriately. More specifically, the defendant admits "In the excitement of the program and our having over thirty (30) Metallics Group sales people from all over America *we might have over reached. We are after all only human.*"

Less than nine (9) days later, Ms. Sarojak is counseled by the management team and then given a written warning for excessive telephone calls. This warning is signed by no less then five (5) members of Metallics management team. Shortly thereafter, Ms. Sarojak is moved into another office, thereby separating her from the one individual who had been assisting her in opposing sexual discrimination, Mr. Sobczak. Not surprisingly, less than three (3) weeks after she complained about sexual harassment (with the assistance of her supervisor), Mr. Sobczak and the plaintiff are ushered into separate offices and simultaneously terminated.

## LEGAL STANDARD

Summary judgment is appropriate when there is no dispute as to a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c). See Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986).* The moving party carries the burden of demonstrating that there is no genuine material dispute of fact. *Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000).* The Second Circuit has cautioned that "in determining whether a genuine issue has been raised, the inferences to be drawn from the underlying facts revealed in the affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Tomka v. Seiler, 66 F.3d 1295, 1304 (2d Cir. 1995).* That court has emphasized that additional considerations apply when ruling on a motion for summary judgment in an employment discrimination case. "In discrimination cases where state of mind is at issue, we affirm a grant of summary judgment in

favor of an employer sparingly because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." *Mandell v. County of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003)* (internal quotation omitted).

## STATEMENT OF FACTS

### Plaintiff's Employment

Plaintiff commenced employment with Defendant Metallics on December 15, 1999. (Pl. Complaint ¶14.) Ms. Sarojak was hired as Metallics' Purchasing Agent. (Pl. Complaint ¶14). Ms. Sarojak's direct supervisor was Mr. Robert Sobczak, Vice President of Operations. (Pl. Complaint ¶13). At all times hereto, plaintiff's job performance and work ethic was never an issue. (Exhibit A, ¶4).

### The Entertainment

On Thursday, March 22, 2001, the defendants hosted a national sales meeting entitled the "Metallics Sales Representatives Tour."("Sales meeting") (Exhibit B). This Sales meeting included at least thirty (30) salespersons from all over the country (Exhibit C). With the exception of one (1) female, the sales representatives were comprised of all males. (Video Tape 01:09; 04:05 and Exhibit A, ¶8). A portion of the Sales meeting was dedicated to and referred to by the Defendant Mola as "the entertainment." (Video Tape 22:24). The "entertainment mainly consisting of four (4) beautiful woman, including the plaintiff (Video Tape 22:30). During the "Entertainment" section of the sales meeting, the employees called upon to participate in the three (3) skits all possessed either battery operated bunnies, bears, or dogs that were undeniably meant to represent that particular employee. (Video Tape 22:55, 23:43, and 24:34). Defendant Mola commenced the "Entertainment" section of the meeting by summoning four (4) young and attractive female employees to the front of the room (Video Tape 22:34). Referring to these four (4) white women as the "Playboy Easter Bunnies," defendant Mola informs the audience that these ladies are

going to demonstrate exactly what it is that we do all day long – to have fun. (Video Tape 22:24).  The four (4) women, possessing light colored bunny rabbits ("Bunnies"), are ushered into the room and instructed to place their Bunnies on the table directly in front of them. (Video Tape 22:30).  Referred to as "Playboy Bunnies" and placed on display for the predominantly male audience, the four (4) women stand side by side while their Bunnies hop up and down on the table. (Video Tape 22:55).  Next, Defendant Mola introduces two (2) black female employees, whom he refers to as "girls," to the front of the room where they are both holding black bears. (Video Tape 23:45).  After placing the black bears on the table, Defendant Mola with an abrupt "c'mon" orders the girls to dance for the salesmen. (Video Tape 23:30).

Immediately after Defendant Mola and the sales force stop laughing, the two (2) black girls are told to exit the room and two (2) large stature black men, Mr. Andre Evans ("Mr. Evans") and Mr. Charles Gibson ("Mr. Gibson"), are introduced. (Video Tape 24:13).  Referring to the two (2) black men as "the big dogs," Mr. Evans and Mr. Gibson enter the room. (Video Tape 24:18).  Armed with dark-colored Scooby Doo dogs that have pogo sticks diagonally appended to its body at waist-level, Mr. Evans and Mr. Gibson place their Scooby Doo dogs on the table. (Video Tape 24:48).  Then the plaintiff, a fair skinned, young attractive white female, is ordered back into the room, where she is reintroduced to the sales representative as "the bunny." (Video Tape 24:50) The plaintiff, holding her bunny, is placed between Mr. Evans and Mr. Gibson and she positions her bunny between the two (2) Scooby Doo dogs (Video Tape 24:50).  At this point the two battery operated dogs and plaintiff's battery operated bunny are facing the audience and hopping up and down. (Video Tape 24:52).  Mr. Mola then, walks over to the table and reaches for the Scooby Doo dog on the right and repositioned it so its appended pogo stick appeared to be fornicating with the plaintiff's bunny from the rear. (Video Tape 25:02).  Shocked at this, the plaintiff covers her face. (Video Tape 25:02).  Then Mr. Gibson reached for the other Scooby Doo dog and repositioned it so that its pogo stick appeared to be fornicating with plaintiff's bunnies from the front.

(Video Tape 25: 06) With the plaintiff's bunny appearing to be violated simultaneously from the front and rear by the two (2) dark colored Scooby Doo dogs, the male audience begins to roar with approval. (Video Tape 25:17). Mr. Evans puts his hands up in the air suggesting more claps and laughter. The plaintiff grabbed her Bunny and quickly exited the room. (Video Tape 25:17). With the laughter in the background and Defendant Mola chuckling he unabashedly states "It'll keep on." (Video Tape 25:24)

Plaintiff immediately left work and sought the support and guidance of her parents. (Exhibit A, ¶23). Upon returning to Metallics, Ms. Sarojak immediately complained to her direct supervisor, Mr. Sobczak, about Mr. Mola's egregious behavior. (Sarojak Dep. at pp. 60). Mr. Sobczak agreed that Mr. Mola's actions were wrong. (Sarojak Dep. at pp. 60). In the morning of March 23, 2001, plaintiff again complained to Mr. Sobczak regarding Mr. Mola's behavior the previous day. (Sarojak Dep. at pp. 61). Plaintiff informed Mr. Sobczak that she wanted to discuss Mr. Mola's egregious behavior with the Human Resources Department. (Sarojak Dep. at pp. 61 and 62). The following week Ms. Sarojak met with the head of Human Resources, Ms. Judith Couture ("Ms. Couture"). (Sarojak Dep. at pp. 61 and 62). At this meeting, plaintiff informed Ms. Couture that she believed Mr. Mola's actions to be wrong and that she was the victim of sexual harassment. (Sarojak Dep. at pp. 62).

*Defendants' Admission of Inappropriate Behavior*

On April 3, 2001, Defendant Metallics submitted a memorandum purportedly authored by "Management" admitting that it might have acted inappropriately. (Exhibit C). Plaintiff and Mr. Sobczak both agreed that Metallics' efforts at addressing plaintiff's sexual harassment complaint was lacking. (Sarojak Dep. at pp. 64).

*Multiple Acts of Unlawful Retaliation*

On April 12, 2001, approximately one (1) week after the defendants disingenuously acknowledged their

participation in sexual harassment, plaintiff is called into a meeting with Ms. Judith Couture, Robert

Sobczak, Richard Paladino, Jan Doudy, and one other unidentifiable member of the alleged Management

team. (Sarojak Dep. at pp.68-70). At this meeting the plaintiff was accused of making too many personal

telephone calls, counseled and than given a written warning. (Exhibit D). Plaintiff did not make personal

telephone calls during working hours. (Sarojak Dep. at pp.66). There are a great majority of Metallics'

employees who make personal telephone calls during work hours. (Sarojak Dep. at pp.69). Plaintiff was

the *only* employee at Metallics that was being written up for allegedly making personal telephone calls

during work hours. (Exhibit G); (Sarojak Dep. at pp. 69).


Approximately four (4) days later, in or about April 16, 2001, Ms. Sarojak is transferred to a smaller more

remote office. (Sarojak Dep. at pp. 73). More importantly, Ms. Sarojak's office is now separated from the

one (1) individual who had supported and assisted her during this time, her direct supervisor, Mr.

Sobczak. (Exhibit A, ¶6). Furthermore, plaintiff was informed that she would now be reporting to Mr.

Robert Friedli and not Mr. Sobczak. (Sarojak Dep. at pp. 71). Incredibly at end of this very same week,

on Friday, April 20, 2001, defendants' third and finally retaliatory act was taken against the plaintiff. Mr.

Robert Friedli ordered Ms. Sarojak into Ms. Couture's office where the plaintiff was informed that her job

position had been eliminated. (Sarojak Dep. at pp. 79-80). At the same time that the plaintiff's job was

eliminated, Mr. Sobczak was in a separate room being separated from his employ from Metallics. (Exhibit

A, ¶37).

*Emotional Distress*

As a result of the defendants' egregious conduct, Ms. Sarojak was unemployed, with no income and no

employment benefits, and no prospects for future employment. (Exhibit A, ¶40) Ms. Sarojak had

experienced emotional distress including a sleep disorder, anxiety, degradation, and a weight loss. Moreover, the plaintiff continues to have problems functioning and/or speaking before large groups in a workplace setting. (Exhibit A, ¶ 39).

**LEGAL ARGUMENTS**

I.     PLAINTIFF HAS CLEARLY ESTABLISHED THE EXISTENCE OF A HOSTILE WORK ENVIRONMENT

II.    PLAINTIFF HAS DEMONSTRATED THAT SHE WAS UNLAWFULLY RETALIATED AGAINST FOR OPPOSING SEX DISCRIMINATION.

III.   DEFENDANT METALLICS' CONDUCT WAS EXTREME AND OUTRAGEOUS AND THE PLAINTIFF HAS SUFFERED SEVERE EMOTIONAL DISTRESS.

IV.    PLAINTIFF'S NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS.

V.     DEFENDANT'S ACTIONS WERE IN BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALINGS.


I.     PLAINTIFF HAS CLEARLY ESTABLISHED THE EXISTENCE OF A HOSTILE WORK ENVIRONMENT

Plaintiff has asserted that she was subjected to a hostile work environment in violation of the prohibition on discrimination on the basis of sex in the workplace as set forth under CFEPA, CONN. GEN. STAT. §46a-51 et seq., and Title VII of the Civil Rights Act of 1964.  Since Courts in this jurisdiction have interpreted CFEPA as to mirror that of its federal counterpart, Title VII, we shall discuss plaintiff's sexual harassment and unlawful retaliation claims using the legal standards set forth under Title VII of the Civil Rights Act of 1964.[2]


Title VII prohibits discrimination by an employer "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex[.]" *42 U.S.C. § 2000e-2(a)(1). In Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986),* the Supreme Court held "that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Id.* at 66.

---

[2]    Connecticut Courts have interpreted CFEPA to mirror the coverage of Title VII. *See, e.g. Brittell v. Dept of Correction, 247 Conn. 148, 164 (Conn. 1998)* ("In defining the contours of an employer's duties under our antidiscrimination statutes, we have looked for guidance to federal case law interpreting Title VII of the Civil Rights Act of 1964, the federal statutory counterpart to §46a-60.")

"[T]o prevail on a hostile work environment claim, a plaintiff must demonstrate: '(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of the work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.'" *Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (quoting Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996).* The Supreme Court has ruled that a work environment must be both subjectively and objectively hostile and abusive in order to establish a hostile environment claim. *Harris v. Forklift Sys.., Inc., 510 U.S. 17, 21-22 (1993).* ("The conduct alleged must be severe and pervasive enough to create an environment that would reasonably be perceived, and is perceived, as hostile or abusive.")

"A plaintiff alleging a hostile work environment 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment.' To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse. Relevant factors include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) and *Harris*, 510 U.S. at 23).The use of the term "may" reiterates the Court's insistence that this is a non-exhaustive list of possible circumstances to consider. Thus, the issue "can be determined only by looking at all the circumstances." *Id.; see also Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) (stating that "it is well-established that the court must consider the totality of circumstances."). Moreover, the Second Circuit has recently cautioned the district courts considering hostile environment claims. *See*

*Feingold v. State of New York, 2004 U.S. App. LEXIS 8543, \*23-\*24 (2d Cir. Apr. 30, 2004); Terry v. Ashcroft, 336 F.3d 128, 147-50 (2d Cir. 2003).* The Second Circuit explained that "[w]hile the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that 'while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.' The environment need not be unendurable or intolerable. Nor must the victim's psychological well-being be damaged. In short, 'the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases.'" *Id. At 148 (quoting Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000); see also Burford v. McDonald's Corporation, Carl Fielod, Timothy Michaud, and Ronald Fedor, Memorandum of Decision, The Honorable Judge Mark R. Kravitz U.S.D.J. Docket No. 3:02cv1738, June 2, 2004.*

In the instant action, viewing the egregious and offensive behavior in its entirety and in the more accurate backdrop from which it occurred, the conduct the plaintiff has complained of is sufficiently severe and pervasive to constitute a hostile work environment. Moreover, as the video tape and undisputed facts demonstrate, plaintiff who was introduced to the mostly male audience as a "Playboy Bunny" is shamelessly showcased with three (3) other young, white, attractive females, having all been previously instructed to "shake their booties." Unlike the other portions of the entertainment, the audience is not provided with the names or the departments of these four (4) individuals. Rather they are referred to as "Playboy Bunnies" and "Beautiful Woman" nothing more, nothing less. In the final skit the plaintiff is called up, without the other women, for an encore appearance where she is forced to take part in the most racist and sexually charged portion of the "entertainment." Again, neither identified by name nor her department, but rather as a "Playboy Bunny," Ms. Sarojak is sandwiched between two (2) large African

Americans, Mr. Andre Evans ("Mr. Evans") and Mr. Charles Gibson ("Mr. Gibson"). Clearly establishing that the plaintiff's stuffed bunny represents Ms. Sarojak and the two (2) Scooby Doo Dogs represent Mr. Evans and Mr. Gibson, defendant Mola, with the direct assistance of Mr. Gibson, repositioned the dogs to create the unmistakable sexual image that the fair haired Ms. Sarojak is being sexually violated from the rear and front by both Mr. Evans and Mr. Gibson at the same time - all to the approval of the forty (40) plus males in the room and all at the expense of the plaintiff.

From the facts stated herein, it is beyond dispute that the defendants' actions were sufficiently severe and pervasive to create a hostile work environment. Consequently, the defendants' Motion for Summary Judgment as to Counts One and Two must fail.

II.     PLAINTIFF HAS DEMONSTRATED THAT SHE WAS UNLAWFULLY RETALIATED AGAINST FOR
        OPPOSING SEX DISCRIMINATION.

Plaintiff has also alleged that she was the victim of unlawful retaliation, also in violation of CFEPA and Title VII. "In order to establish a prima facie case of retaliation, "a plaintiff must demonstrate that (1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against the plaintiff; and (4) a casual connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Mack v. Otis Elavtor Co., 326 F.3d 116, 129 (2d Cir. 2003) (internal quotations omitted).*

In the instant action, the plaintiff has sufficiently alleged a prima facie case of unlawful retaliation. More specifically, plaintiff has submitted credible evidence that: (1) she complained about being sexually harassed by defendant Mola, an activity protected under Title VII; (2) the defendants were aware of and

actually acknowledged Ms. Sarojak's participation in the protected activity;[3]    (3) within three weeks of complaining about the sexual harassment, Ms. Sarojak is subjected to a number of adverse employment actions by the defendants culminating in her employment termination; and that the facts as alleged (4) demonstrate the casual connection between her engaging in protective activity and the subsequent adverse employment action.

i.    *Plaintiff Engaged in Protected Activity.*

It has not been disputed that the plaintiff engaged in protected activity.  This protected activity included several oral complaints of sexual harassment to her direct supervisor, Mr. Robert Sobczak and a meeting with defendant Metallics' management personnel, including its Director of Human Resources, Ms. Judith Couture.

ii.    *Defendants were well aware of Plaintiff's Participation in Protected Activity*

As the memorandum of April 3, 2001 from "management" demonstrates, Defendants were very much aware of plaintiff's opposition to the sexual harassment.  More specifically, management affirmatively acknowledges that, "[i]t was recently brought to management's attention that the skit involving some of you might have been misunderstood.  In the excitement of the program and our having over thirty (30) Metallics Group sales people from all over America we might have overreached." (Exhibit C).  This memorandum not only demonstrates that Ms. Sarojak challenged Defendant Mola's unlawful behavior, it further evidences that the defendants did in fact act inappropriately that afternoon.  Indeed, Ms. Sarojak's complaint over what arguably started from a "singular incident was (so) extraordinarily severe…(that it)

---

[3]      Moreover, defendants admit as much in its Memorandum of April 3, 2001 (Exhibit C);

altered the conditions of her work environment" such that "Management" directly addressed it in its memorandum of April 3, 2001.

iii.    *Adverse Employment Action.*

Plaintiff has sufficiently alleged that she was subjected to a series of adverse employment actions that culminated in her being terminated.  An adverse employment action is one which is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997).* "An adverse action is one that affects the terms, privileges, duration, or conditions of employment." *Yerdon v. Henry, 91 F.3d 370, 378 (2d Cir. 1996).*

To aver that the plaintiff was subjected to adverse employment action is somewhat of an understatement, given the series of adverse employment actions taken against the plaintiff immediately after she complained about Defendant Mola's egregious behavior.  As the undisputed facts demonstrate, in less than one (1) month after being sexually harassed and filing a complaint with defendant Metallics, plaintiff was:

1.   Counseled by no less then five (5) individuals about excessive personal telephone calls;

2.   Given a written warning that was signed by no less than five (5) members of the "management team;"

3.   Removed from a larger, more spacious office to a smaller office – and more importantly separated from the one (1) individual, Mr. Robert Sobczak, who had supported her during the sexual harassment and her filing a complaint; and

4.   Terminated from her employment.

Thus, plaintiff has certainly demonstrated that she was wrongfully subjected to adverse employment actions by the defendants.

*iv.*        *Causal Connection.*

Finally, plaintiff has established the existence of a causal connection between her involvement in protected activity and the above referenced adverse employment action. "A plaintiff alleging retaliation in a Title VII case may rely upon a "broad array" of evidence to establish causation." *Farrell v. Planters Lifesavers Co., 206 F.3d 271, 283 (3d Cir. 2000).* As instructed by the Third Circuit, district courts may look to the record as a whole, and may consider, among other things, evidence of temporal proximity between the alleged events, evidence of retaliatory animus or antagonism, and pretext to infer causation. *Farrell at 285-86.*

As the undisputed facts demonstrate – the time period between plaintiff's participation in activities protected by Title VII and the commencement of the numerous adverse employment actions is extremely short. Moreover, in less than one (1) month time, plaintiff is counseled for allegedly making personal telephone calls, given a written warning, transferred to a smaller office and finally terminated from her employment. This temporal proximity between plaintiff's protected conduct and the employer's adverse actions, when considered together with other evidence, viewed in a light most favorable to plaintiff, certainly give rise to an inference of causation.

Additionally, upon receiving an employee written warning from the defendant, plaintiff had inquired of Ms. Couture as to whether any other employee was receiving such a warning. Not surprisingly, Ms. Couture responded, "No, just you." The fact that no employee other then the plaintiff was issued a written warning for allegedly making personal phone calls further underscores the retaliatory rancor of the defendants (See Request for Production Numbers 29, 30, and 31 – attached hereto as Exhibit D).

In addition to the disparate treatment and temporal nexus, courts have looked at other additional evidence

to infer a retaliatory animus. "When temporal proximity between protected activity is missing courts may look to the intervening period for other evidence of retaliatory animus." *Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997).* As the record demonstrates, Mr. Robert Sobczak was instrumental in assisting and supporting Ms. Sarojak in her participation in activities protected by Title VII and CFEPA-namely ensuring that her complaint of sexual harassment was addressed by Metallics. For his efforts, Mr. Sobczak experienced the same retaliatory rancor that Ms. Sarojak had endured. Most notably, almost immediately after plaintiff, with the help of Mr. Sobczak, complains about sexual harassment, Mr. Sobczak is demoted, replaced by another employee, and relieved as plaintiff's direct supervisor. To further separate the two (2), Ms. Sarojak is transferred to a smaller more remote office away from Mr. Sobczak. Less then, seventy two (72) hours later, at the exact same time that Ms. Sarojak is called into a room and informed that her job position had been eliminated, Mr. Sobczak is brought into a different room and also notified that he too is being discharged as a result of a job elimination. *(Query: Is it not more then a mere coincidence that the two (2) individuals who opposed defendants' discriminatory employment practices both experienced adverse employment actions and then are both simultaneously discharged?)*

Thus, the temporal nexus is short and an inference of causation has been established, consequently defendants' motion as to Counts Three and Four must also fail.

III.    DEFENDANT METALLICS' CONDUCT WAS EXTREME AND OUTRAGEOUS AND THE PLAINTIFF HAS SUFFERED SEVERE EMOTIONAL DISTRESS.

In order to assert a claim for intentional infliction of emotional distress, the plaintiff must establish four elements: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that the emotional distress was a likely result of his conduct; (2) that the conduct was extreme and

19

outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the distress suffered by the plaintiff was severe." *Petyan v. Ellis*, 200 Conn. 243, 253. 510 A.2d 1337 (1986); *see also Cavuoto v. Oxford Health Plans, Inc.*, No. 3:99-CV-00446 (EBB), 2000 WL 888263 at *8 (D.Conn. June 22, 2000).

Whether the defendants' conduct is sufficient to satisfy the element of extreme and outrageous conduct is a question, in the first instance, for the Court. *Johnson v. Chesebrough-Pond's USA Co.*, 918 F.Supp. 543, 552 (D.Conn.), *aff'd*, 104 F.3d. 355 (2d Cir.1996). "Where reasonable minds can differ, however, it becomes an issue for the jury." *Bell v. Bd. Of Educ. Of West Haven*, 55 Conn. App. 400, 410, 739 A.2d 321 (1999). Liability for intentional infliction of emotional distress requires conduct that is so extreme and outrageous that it goes beyond all possible bounds of decency, is regarded as atrocious, is utterly intolerable in a civilized society, and is of a nature that is especially calculated to cause, and does cause, mental distress of a very serious kind. *See Taylor v. Maxxim Medical, Inc.*, 2000 WL 630918 at *3 (D.Conn.2000); *Rapkin v. Rocque*, 97 F.Supp.2d 244 (D.Conn.2000), *citing Petyan*, 200 Conn. at 254 n. 5, 510 A.2d 1337 and *DeLaurentis v. New Haven*, 220 Conn. 225, 266-67, 597 A.2d 807 (1991); *Johnson*, 918 F.Supp. at 552 (general rule "is that there is liability for conduct exceeding all bounds usually tolerated by a decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind"), *quoting Mellaly v. Eastman Kodak Co.*, 42 Conn. Supp. 17, 19-20, 597 A.2d 846 (Conn.Super.Ct.1991); *see also Cavuoto*, 2000 WL 888263 at *8; 1 Restatement (Second) at comment (d) ("[C]onduct must be so outrageous and extreme . . . as to go beyond all possible grounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."). Thus, "[i]t is the intent to cause injury that is the gravamen of the tort." *DeLaurentis*, 220 Conn. at 266-67, 597 A.2d 807, *citing Hustler Magazine v. Falwell*, 485 U.S. 46, 53, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).

Liability for intentional infliction of emotional distress requires conduct that exceeds "'all bounds usually tolerated by decent society . . . .'" *Petyan v. Ellis, supra, 200 Conn. 254 n.5, quoting W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 12, p. 60.* "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" 1 Restatement (Second), Torts § 46, comment (d), p. 73 (1965). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Mellaly v. Eastman Kodak Co., 42 Conn. Sup. 17, 19, 597 A.2d 846 (1991).*

In the instant case, viewing the allegations in the light most favorable to the plaintiff, the defendants' action, as alleged, clearly can be viewed as "outrageous and extreme . . . [as] to be regarded as atrocious and utterly intolerable in a civilized society."

Moreover, as if it was not outrageous enough that the plaintiff was forced to participate in a skit in front of a large number of male colleagues, sandwiched between two (2) large African American males – but Mr. Mola had to leave no doubt in the mind of his audience regarding his perverse motives and sense of humor by manipulating the Scooby Doo Dogs in such a manner as to emphasize that the two (2) African American males - "the big dogs" were fornicating with the plaintiff at the same time. – One (1) from the front and one (1) from the rear.  This behavior, as alleged *and admitted by the defendants*, certainly exceeds all bounds usually tolerated by a decent society, and would most certainly evince an average member of the community to exclaim, "Outrageous".

21

In addition to having a sleep disorder, experiencing a weight loss and overcoming bouts of stress and anxiety, defendants' actions have now turned this once confident individual into a nervous and timid victim – especially in group settings.   More specifically Ms. Sarojak is now literally petrified of interacting or participating in front of large groups.  Thus her work performance has suffered.

Therefore, Ms. Sarojak has sufficiently demonstrated that the defendants' conduct was of such an extreme and outrageous nature as to support a claim for intentional infliction of emotional distress.


IV.     PLAINTIFF'S NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

In plaintiff's Amended Complaint, Ms. Sarojak had a Count for Negligent Infliction of Emotional Distress.  In response to one of defendants' numerous motions and as a means of avoiding any further needless motion practice, Plaintiff conceded this claim.  (See Plaintiff's Motion in Opposition to Defendants' Motion to Dismiss "In light of the holding in *Perodeau v. Hartford*, 259 Conn. 729, 792 A.2d 752 (2002), the plaintiff does not oppose the dismissal of Count Six (6) [Negligent Infliction of Emotional Distress])."  Thus, the plaintiff is again is willing to concede this Count without further burdening this Court.


V.     DEFENDANT'S ACTIONS WERE IN BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALINGS.

In its Motion for Summary Judgment, Metallics argues that the plaintiff's Good Faith and Fair Dealings count must fail because Ms. Sarojak has an adequate remedy available to her under Title VII. Interestingly, the defendants also seek to have her Title VII claims dismissed as well.  This circular reasoning by the defendants, rather disingenuously, attempts to deprive Ms. Sarojak of her day in court for the heinous actions of Metallics and Mr. Mola.  Moreover, if the Court is to deny defendant's Motion

and allow the plaintiff to bring her Title VII and CFEPA claims before a trier of fact, an argument may be made that the plaintiff has an adequate statutory remedy available to her.  Conversely, if the Court is inclined to dismiss Counts One and Two then but for the Implied Covenant of Good Faith and Fair Dealings, the plaintiff would not have an adequate remedy available to her.

CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment as to Counts One, Two, Three, Four, Five, and Eight should be denied.  Genuine issues of material facts exist as to plaintiff's claims, and a jury could find for the plaintiff on each count of the Amended Complaint.

RESPECTFULLY SUBMITTED,
PLAINTIFF,
MARY SAROJAK

Robert Fortgang
Federal Bar No.  ct 05437
Robert Fortgang Associates
Greystone Court - 573 Hopmeadow Street
Simsbury, CT  06070